FILED
United States Court of Appeals
Tenth Circuit

**March 14, 2011**

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

DAVID K. RICHISON,

      Plaintiff - Appellant,

v.

ERNEST GROUP, INC., d/b/a
Paycom; CHAD R. RICHISON;
CRAIG BOELTE; SHANNON
RICHISON (ROWE); JAMES
JORDAN; WILLIAM KERBER,

      Defendants - Appellees.

No. 09-6301

---

**Appeal from the United States District Court
for the Western District of Oklahoma
(D.C. No. 5:09-CV-00351-F)**

---

Ross A. Plourde (Drew D. Webb and Daniel A. Loeffler with him on the briefs),
McAfee & Taft, A Professional Corporation, Oklahoma City, Oklahoma, for
Plaintiff-Appellant.

John P. Falcone, Cheek & Falcone, PLLC, Oklahoma City, Oklahoma, for
Defendants-Appellees.

---

Before **KELLY,** Circuit Judge, **BRORBY,** Senior Circuit Judge, and
**GORSUCH**, Circuit Judge.

---

**GORSUCH**, Circuit Judge.

David Richison filed this lawsuit in 2009 alleging that his former co-workers tricked him into giving up his shares in the small software company where he used to work. While it's not clear whether Mr. Richison's shares were taken from him rightly or wrongly, it is clear they were taken from him long ago — in 2000. For this reason, the district court held all of Mr. Richison's claims for relief, brought nine years later, time-barred under the applicable limitations statutes. On appeal, Mr. Richison seeks reversal based on a new legal theory he never pressed before the district court. This he cannot do — at least not without showing plain error, a feat he doesn't even attempt. So it is that we must and do affirm.

In the 1990s, David Richison was a shareholder, director, and officer of Ernest Group, Inc. ("EGI"). But the relationship soured over the years and, in January 2000, it unraveled completely. That month, Mr. Richison signed a memo "resign[ing] from all positions in Ernest Group" and "forfeit[ing] . . . ownership of all 125 shares." R.O.A. at 193. From then on, EGI no longer treated Mr. Richison as an officer, director, or shareholder, and soon the company reissued Mr. Richison's shares to other employees. For his part, Mr. Richison ceased reporting any ownership interest in EGI on his tax returns, though for a brief time he continued to work at the company in the more limited capacity of a salaried employee. This last lingering link, however, was soon severed when, in 2001, Mr. Richison quit working for EGI entirely. Shortly thereafter, Mr. Richison

contacted the company's accountant, asking that he not be listed as either an officer or shareholder on the corporation's tax returns.

For the next several years Mr. Richison and EGI had little contact, but two events stand out. In 2002, EGI's president came to Mr. Richison's house, asking Mr. Richison to (re-)confirm that he'd relinquished his shares back in 2000. Despite his earlier disavowals of share ownership, Mr. Richison now refused to cooperate. Then, in 2007, EGI's accountant tried again, allegedly telling Mr. Richison that the company was facing an IRS audit, and that there would be "deep trouble" unless Mr. Richison signed a document confirming the transfer of his shares in 2000. This time, Mr. Richison agreed to cooperate and signed the accountant's document.

Mr. Richison later discovered there was no IRS audit. Instead, he says, the accountant's 2007 phone call was a ploy to enrich EGI's officers and owners by facilitating the sale of a controlling interest in the company to a private equity firm. Arguing that he had been misled, Mr. Richison filed this diversity suit in 2009 alleging conversion, civil conspiracy, unjust enrichment, and breach of fiduciary duty — all in violation of Oklahoma law. In support of all these claims, Mr. Richison pursued a singular theory of the facts. He alleged that he retained full possession of his shares in EGI through 2007. And he alleged that it was only when the company's accountant approached him in 2007 that he signed a document relinquishing his interest in the shares.

In reply, the defendants moved for summary judgment. The undisputed facts, they submitted, showed that Mr. Richison gave up his EGI shares in 2000, not 2007. Because Mr. Richison's claims were based solely on the unlawful taking of his shares, the defendants submitted that all his claims accrued nine, not two, years earlier. And this, they contended, meant that all of Mr. Richison's claims were time-barred under the relevant Oklahoma statutes of limitations. The district court agreed with all this and granted summary judgment to the defendants. It is this result Mr. Richison now appeals.

We begin our analysis by looking to Oklahoma limitations law. Oklahoma follows the traditional rule that the statute of limitations generally begins to run when the litigant's claim accrues — that is, when he or she can first maintain the claim to a successful conclusion. *See Consolidated Grain & Barge Co. v. Structural Systems, Inc.*, 212 P.3d 1168, 1171 (Okla. 2009). In this case, each of Mr. Richison's tort claims expressly rests on an allegation that he had full possession of EGI shares until the defendants took them from him in 2007. *See* Am. Compl. ¶ 2; Resp. to Def.'s Mot. for Sum. J. at 1. Yet, as we've seen, the undisputed facts in this case show that the shares were taken from Mr. Richison back in 2000. It was then that Mr. Richison turned in his resignation "forfeit[ing] ownership of all 125 shares"; then that EGI removed him from the corporation's roster of shareholders; and then that the company began treating him as an employee, not an owner, in its tax filings. Indeed, the undisputed facts show that

- 4 -

until filing this suit Mr. Richison hadn't asserted ownership, or exerted dominion and control, over the shares for almost a decade. It was in 2000, if ever, that a claim for the taking of his stock first could have been brought and so accrued for limitations purposes under Oklahoma law. Given that the longest statute of limitations possibly applicable to Mr. Richison's tort claims is five years, *see* 12 Okla. Stat. § 95, those claims are time-barred, one and all, just as the district court held.

Of course, Mr. Richison argues that the district court erred. In his view, there is a live factual dispute for the jury to resolve regarding whether his shares were taken in 2007 rather than 2000. A jury could find that his shares were taken from him in 2007, he says, because the document he signed in 2000 relinquishing his interest in them was not legally enforceable. All this, however, misses the point. Whether the document Mr. Richison signed in 2000 relinquishing his shares was an enforceable contract surely bears on the question whether the defendants were *legally authorized* to take the shares. But to determine when the clock on Mr. Richison's tort claims began to run, we don't ask when (or even whether) the defendants *lawfully* obtained the rights to plaintiff's property. Instead, what matters is when his tort claims first accrued — that is, when he first could've alleged that the defendants' conduct was *unlawful*. And whatever we may say about the propriety of the defendants' conduct, the undisputed facts show

that any claim involving the wrongful taking of Mr. Richison's shares accrued in 2000, not in 2007.[1]

Recognizing the trouble with this theory, Mr. Richison seeks to introduce another, back-up theory on appeal. Even if the defendants did take his shares in 2000 as they contend, Mr. Richison says that their actions in 2007 still tortiously deprived him of a *claim* to those shares. Surely, he says, giving up even a weak claim of interest in the shares — even clearing up a mere shadow of a doubt about their status — had *some* value to EGI in 2007, especially given that the company was allegedly seeking to polish its records in preparation for a plump stock sale. And, Mr. Richison contends, he had a right to exact a fee for quitting that claim, rather than being duped into giving it away for free.

---

[1] Neither does the discovery rule salvage Mr. Richison's claims. The discovery rule, of course, tolls the statute of limitations until a plaintiff acquires "sufficient information, which, if pursued, would lead to the true condition of things." *Daugherty v. Farmers Coop. Ass'n*, 689 P.2d 947, 950-51 (Okla. 1984). In this case, however, the undisputed facts show that Mr. Richison had ample reason to know since the early 2000's that the defendants had taken his shares. After all, Mr. Richison himself expressly disclaimed his interest in the shares in 2000 and, in July of 2001, contacted EGI's accountant to ask that he not be listed as either an officer or shareholder on the corporation's tax returns. In his own tax returns, Mr. Richison likewise ceased reporting an ownership interest in EGI that year — and hasn't reported one since. Even if we could (somehow) overlook all this evidence regarding Mr. Richison's knowledge in 2000 and 2001, there remains the fact that the president of EGI visited Mr. Richison in 2002 and asked him for written confirmation of the 2000 transfer. At that point, *any* reasonable person would have had sufficient information, as a matter of law, to know that others were asserting ownership of and dominion over the shares.

This is a much more plausible theory, one far more consistent with the facts as they emerged at summary judgment. But the problem is Mr. Richison never pursued it in the district court. In his complaint, Mr. Richison alleged *only* that he retained full possession of the EGI shares in 2007 and that the defendants took those shares from him *that* year. At summary judgment, the defendants challenged Mr. Richison's factual account, arguing that his claims were time-barred because any such taking occurred in 2000, not 2007. On notice and in the face of this challenge, Mr. Richison chose to respond to the defendants' dispositive motion only by contesting the defendants' *facts*, steadfastly maintaining that he retained possession of the shares through 2007. At no point did he introduce the alternative *legal theory* that, even if he relinquished the shares in 2000, he was tortiously misled into confirming that fact in 2007. Thus we cannot agree with Mr. Richison's contention that his pleadings before the district court fairly presented this alternative legal theory for the court's consideration.

Where, as here, a plaintiff pursues a new legal theory for the first time on appeal, that new theory suffers the distinct disadvantage of starting at least a few paces back from the block. If the theory was intentionally relinquished or abandoned in the district court, we usually deem it waived and refuse to consider it. *See United States v. Olano*, 507 U.S. 725, 733 (1993); *United States v. Teague*, 443 F.3d 1310, 1314 (10th Cir. 2006); *see also Singleton v. Wulff*, 428

U.S. 106, 120 (1976) ("It is the general rule, of course, that a federal appellate court does not consider an issue not passed upon below."); *Lone Star Steel v. United Mine Workers of Am.*, 851 F.2d 1239, 1243 (10th Cir. 1988) ("Ordinarily, a party may not lose in the district court on one theory of the case, and then prevail on appeal on a different theory."). By contrast, if the theory simply wasn't raised before the district court, we usually hold it forfeited. *See Olano*, 507 U.S. at 731; *Teague*, 443 F.3d at 1314. "Waiver is accomplished by intent, but forfeiture comes about through neglect." *See United States v. Zubia-Torres*, 550 F.3d 1202, 1205 (10th Cir. 2008) (quoting *United States v. Carrasco-Salazar*, 494 F.3d 1270, 1272 (10th Cir. 2007)). Unlike waived theories, we will entertain forfeited theories on appeal, but we will reverse a district court's judgment on the basis of a forfeited theory only if failing to do so would entrench a plainly erroneous result. *See Zubia-Torres*, 550 F.3d at 1205. To show plain error, a party must establish the presence of (1) error, (2) that is plain, which (3) affects substantial rights, and which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See id.* at 1208. Naturally, a litigant in Mr. Richison's position would prefer to have us consider a previously unraised theory merely forfeited rather than waived.

Yet, instead of attempting to show plain error, Mr. Richison says we may forgo plain error review entirely because his new theory is "purely legal" and does not require any additional fact-finding. In doing so, however, Mr. Richison

overlooks our controlling precedent. Long ago, this court held that we will reverse on the basis of a legal theory not previously presented to the district court when the correct resolution of that theory is beyond a reasonable doubt and the failure to intervene would result in a miscarriage of justice. *See Petrini v. Howard*, 918 F.2d 1482, 1483 n.4 (10th Cir. 1990); *see also Bartlett-Collins Co. v. Surinam Nav. Co.*, 381 F.2d 546, 550 (10th Cir. 1967); *Gomes v. Williams*, 420 F.2d 1364, 1367 (10th Cir. 1970); *Stahmann Farms, Inc. v. United States*, 624 F.2d 958, 961 (10th Cir. 1980); *Hicks v. Gates Rubber Co.*, 928 F.2d 966, 970 (10th Cir. 1991); *United States v. 9844 South Titan Court*, 75 F.3d 1470, 1481-82 (10th Cir. 1996) (all using similar formulations). More recently, we have stated this standard in slightly different terms, requiring a litigant to show the four elements of plain error. *See Emp'rs Reinsurance Corp. v. Mid-Continent Cas. Co.*, 358 F.3d 757, 769 (10th Cir. 2004) (applying plain error to forfeited legal arguments); *Ecclesiastes 9:10-11-12, Inc. v. LMC Holding Co.*, 497 F.3d 1135, 1142 (10th Cir. 2007) (same). Linguistic packaging aside, the substantive analysis under either articulation of the standard is similar, *see Titan Court*, 75 F.3d at 1481, and the litigant's burden is the same: establishing a clear legal error that implicates a miscarriage of justice. Thus, our long-standing practice has been to review newly raised (but not waived) legal arguments under what

substantively amounts to (and what we have more recently described as) the plain error standard, and we confirm this rule again today.[2]

To be sure, as we've noted previously, this court's cases haven't always been so precise in distinguishing between waiver and forfeiture. *See Zubia-Torres*, 550 F.3d at 1205 & n.1. Neither, as it turns out, have they always been so precise about applying the plain error/manifest injustice standard to newly raised legal theories. *See, e.g., Proctor & Gamble Co. v. Haugen*, 222 F.3d 1262, 1270-71 (10th Cir. 2000); *Geddes v. United Staffing Alliance Emp. Med. Plan*, 469 F.3d 919, 931 (10th Cir. 2006); *United States v. Jarvis*, 499 F.3d 1196, 1202 & n.6 (10th Cir. 2007) (all reversing based on new legal theories without explicitly finding plain error or manifest injustice). But, despite this imprecision, no case in this circuit has held that we may reverse based on "purely legal" arguments in the absence of plain error. And the fact that this court has sometimes reversed on the basis of a new legal argument without indicating the burden the appellant must carry to obtain reversal cannot ensconce binding precedent requiring or allowing us to ignore the longstanding requirement that new legal arguments overcome plain error. *See Cooper Indus., Inc. v. Aviall Svcs., Inc.*, 543 U.S. 157, 170 (2004) (noting that "questions which merely lurk in the record [of earlier cases],

---

[2] Although the Supreme Court has advised us that there are "circumstances in which a federal appellate court is justified in resolving an issue not passed on below," the Court has consistently left the job of defining the bounds of such circumstances to the courts of appeals. *Singleton*, 428 U.S. at 121; *see also Exxon Shipping Co. v. Baker*, 554 U.S. 471, 487 (2008).

neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents"). What's more, even if the silence of *Haugen*, *Geddes*, and *Jarvis* could be understood as a deliberate relaxing of the miscarriage of justice/plain error requirement, our older and so controlling cases (*Petrini*, *Bartlett-Collins*, *Stahmann*, *Hicks*, and *Titan Court*) *all* discuss appellate intervention only in the presence of legal error *and* manifest injustice, as the plain error standard requires. So it is that our precedent does nothing to preclude — and instead does a great deal more to affirm — our conclusion that plain error review should pertain in these circumstances.[3]

Other considerations support this result. Allowing Mr. Richison to receive unconditional review of his newly minted legal theory would risk affording more forgiving appellate procedures to civil litigants like Mr. Richison than to similarly situated criminal defendants. By rule, criminal defendants may seek review of unwaived arguments "not brought to the [district court's] attention" only under

---

[3] *Jarvis* illustrates how we have, on occasion, come to reverse based on a forfeited argument without addressing the standard for doing so. In that case, we evaluated only whether the legal nature of the newly presented argument allowed us to *consider* it — that is, whether it could be advanced on appeal at all. *See Jarvis*, 499 F.3d at 1202 n.6. That question, of course, now has a simple and well-settled answer: we are free to consider *any* new argument (legal or otherwise) provided it was not waived in the district court. *See Zubia-Torres*, 550 F.3d at 1205. *Jarvis* didn't, however, address the *burden* that must be carried by such a forfeited argument to justify reversal, as evidenced by the fact it didn't discuss or apply the plain error/miscarriage of justice rule already established by *Petrini*, *Stahmann Farms*, and *Titan Court*. So, when it comes to the question raised by Mr. Richison — whether an appellant needs to show plain error to win reversal on a new legal theory — *Jarvis* is silent.

the plain error standard. *See* Fed. R. Crim. P. 52(b). It would be highly anomalous, we think, to afford civil appellants like Mr. Richison a more forgiving standard than we provide criminal defendants, especially as the Supreme Court has cautioned us (repeatedly) against creating unwarranted exceptions to plain error review in the criminal context. *See Johnson v. United States*, 520 U.S. 461, 465-66 (1997); *Puckett v. United States*, 129 S. Ct. 1423, 1429 (2009), *overruling United States v. Peterson*, 225 F.3d 1167 (10th Cir. 2000).

Neither would the result Mr. Richison seeks sit easily with the larger structure of our adversarial and appellate systems. Our adversarial system endows the parties with the opportunity — and duty — to craft their own legal theories for relief in the district court. It is the significant but limited job of our appellate system to correct errors made by the district court in assessing the legal theories presented to it, not to serve as "a second-shot forum . . . where secondary, back-up theories may be mounted for the first time." *Tele-Communications, Inc. v. C.I.R.*, 104 F.3d 1229, 1233 (10th Cir. 1997) (internal quotation marks omitted). Affording plenary appellate review to newly raised legal theories would do much to undermine this adversarial and appellate order. It would force the judicial system to permit costly "do-overs" in the district court anytime a party can conceive a new winning argument on appeal — even when the district court answered perfectly every question of law the parties bothered to put before it. It would also work unfairness on appellees who, no doubt, thought

they knew the legal questions at issue in the case by the time of appeal, only to be surprised when a new threat to their victory in the district court emerges from nowhere for the first time in the pages of an appellate brief. Under our plain error rule, parties have the opportunity not only to present whatever theory they desire in the district court, but also to explain why their substantial rights and the integrity of our judicial system justify undoing the work of that district court on the force of an argument they didn't present the first time around. It would be wasteful, and an invitation for potential abuse, to permit a second trip to the district court on the basis of any lesser showing.

This reluctance to command do-overs in the district court is also why we treat arguments for *affirming* the district court differently than arguments for *reversing* it. We have long said that we may affirm on any basis supported by the record, even if it requires ruling on arguments not reached by the district court or even presented to us on appeal. *See United States v. Davis*, 339 F.3d 1223, 1227 (10th Cir. 2003); *Griess v. State of Colo.*, 841 F.2d 1042, 1047 (10th Cir. 1988); *see also S.E.C. v. Chenery Corp.*, 318 U.S. 80, 88 (1943) ("[I]n reviewing the decision of a lower court, it must be affirmed if the result is correct although the lower court relied upon a wrong ground or gave a wrong reason.") (internal quotation omitted). This preference for affirmance no doubt follows from the deference we owe to the district courts and the judgments they reach, many times only after years of involved and expensive proceedings. Because of the cost and

risk involved anytime we upset a court's reasoned judgment, we are ready to affirm whenever the record allows it. So it is that appellants must always shoulder a heavy burden — they must come ready *both* to show the district court's error and, when necessary, to explain why no other grounds can support affirmance of the district court's decision. And this burden is rightfully all the higher when the argument for reversal wasn't even presented to the lower court.

For all these reasons, we reject Mr. Richison's invitation to overlook the fact that he forfeited his alternative claim to relief. If a newly raised legal theory is entitled to appellate review at all — if it wasn't waived before the district court — it may form a basis for *reversal* only if the appellant can satisfy the elements of the plain error standard of review. In civil cases this often proves to be an "extraordinary, nearly insurmountable burden," *see Emp'rs Reinsurance Corp.*, 358 F.3d at 770. Before us, however, Mr. Richison hasn't even attempted to show how his new legal theory satisfies the plain error standard. And the failure to do so — the failure to argue for plain error and its application on appeal — surely marks the end of the road for an argument for reversal not first presented to the district court. *See McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010) (noting that "even if [a party's] arguments were merely forfeited before the *district court*, [the] failure to explain . . . how they survive the plain error standard waives the arguments in *this* court").

That said, we appreciate that Mr. Richison's decision not to raise his alternative theory of relief before the district court could have been the product of a well-reasoned, and even shrewd, decision. It very well may be that he or his counsel judged the lawsuit worthwhile only if they could recoup the full value of the shares, not some comparatively small expected settlement value associated with Mr. Richison's decision in 2007 to confirm his earlier relinquishment of the shares. Likewise, Mr. Richison or his counsel may have thought an alternative value-of-the-claim theory would be distracting from or detrimental to the argument that Mr. Richison was a shareholder in 2007, and decided it wasn't worth the risk. But however reasonable Mr. Richison's decision was not to pursue a different legal theory before the district court, we are equally certain that Mr. Richison may not now revisit that decision on appeal without at least satisfying the plain error standard of review.

*Affirmed.*